**United States District Court**

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES GYPSUM COMPANY,

      Plaintiff,                    No. C 04-04941 JSW

    v.                         **CLAIM CONSTRUCTION ORDER**

PACIFIC AWARD METALS INC,

      Defendant.

                                   /

      The Court held a claim construction hearing to construe the disputed claim terms of U.S. Patent No. 5,131,198 (the "'198 Patent") pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), on November 2, 2005.  Having carefully reviewed the parties' papers, heard the parties' arguments, and considered the relevant legal authority, the Court will now construe the disputed claim terms within the '198 Patent.

**BACKGROUND**

      Plaintiff United States Gypsum Company ("USG") seeks to prevent Defendant Pacific Award Metals, Inc. ("Award") from infringing the '198 Patent.  The '198 Patent relates to corner beads for drywall construction and particularly to corner beads having an outer paper layer.  ('198 Patent, col. 1, ll. 9-11.)

**United States District Court**

For the Northern District of California

1  The parties dispute two terms: "protective coating"[1] and "said protective coating

2  penetrating some of the fibers of said front paper layer and having a thickness on the front

3  surface of said front paper layer of about 0.001 to 0.005 inches."

**ANALYSIS**

**A.    Legal Standard.**

6  "It is a bedrock principle of patent law that the claims of a patent define the invention to

7  which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water*

8  *Filtration Sys.*, *Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  The interpretation of the scope and

9  meaning of disputed terms in patent claims is a question of law and exclusively within the

10  province of a court to decide. *Markman v. Westview Instruments*, *Inc.*, 517 U.S. 370, 372

11  (1996).  The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure*

12  *Water*, 381 F.3d at 1116.  As a result, a court undertaking the construction of disputed terms

13  "looks to those sources available to the public that show what a person of skill in the art would

14  have understood the disputed claim language to mean." *Id*.  In most cases, a court's analysis

15  will focus on three sources: the claims, the specification, and the prosecution history. *Markman*

16  *v. Westview Instruments*, *Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

17  (1996).  However, on occasion, reliance on extrinsic evidence regarding the relevant scientific

18  principles, the meaning of technical terms, and the state of the art at the time at the time the

19  patent issued is appropriate.

20  The starting point of the claim construction analysis is an examination of the specific

21  claim language.  A court's "claim construction analysis must begin and remain centered on the

22  claim language itself, for that is the language that the patentee chose to particularly point out and

23  distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure*

24  *Water*, 381 F.3d at 1116 (internal quotations and citations omitted).  Indeed, in the absence of an

25  express intent to impart a novel meaning to a term, an inventor's chosen language is given its

26

27  [1]    There is a typographical error in claim 1 of the '198 Patent referring to a
"protected coating." ('198 Patent, col. 4, l. 58.).  The parties agree that this reference should
28  be construed as "protective coating." (Joint Claim Construction and Prehearing Statement at
2.)

2

**United States District Court**

For the Northern District of California

1    ordinary meaning.  *York Prods*., *Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568,

2    1572 (Fed. Cir. 1996).  Thus, "[c]laim language generally carries the ordinary meaning of the

3    words in their normal usage in the field of the invention."  *Invitrogen Corp.* v. *Biocrest Mfg.*,

4    *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003) ("Claim language generally carries the ordinary

5    meaning of the words in their normal usage in the field of invention."); *see also Renishaw v.*

6    *Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the

7    claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins

8    and ends in all cases with the actual words of the claim").  A court's final construction,

9    therefore, must accord with the words chosen by the patentee to mete out the boundaries of the

10   claimed invention.

11        A court also may look to intrinsic evidence, including the written description, the

12   drawings, and the prosecution history, if included in the record, to provide context and

13   clarification regarding the intended meaning of the claim terms because the claims do not stand

14   alone.  *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002).  Rather,

15   "they are part of 'a fully integrated written instrument.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303,

16   1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978).  The specification "may act

17   as a sort of dictionary, which explains the invention and may define the terms used in the

18   claims."  *Markman*, 52 F.3d at 979.  The specification also can indicate whether the patentee

19   intended to limit the scope of a claim, despite the use of seemingly broad claim language.

20   *SciMed Life Sys.*, *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir.

21   2001) (recognizing that when the specification "makes clear that the invention does not include

22   a particular feature, that feature is deemed to be outside the reach of the claims of the patent,

23   even though the language of the claims, read without reference to the specification, might be

24   considered broad enough to encompass the feature in question").

25        Intent to limit the claims can be demonstrated in a number of ways.  For example, if the

26   patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the

27   disputed term in either the specification or the prosecution history," a court will defer to that

28   definition.  *CCS Fitness*, *Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  All

3

that is required to so limit the claims is for the patentee to set out the alternative meaning in the specification "in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117.  In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367.  Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary.  *Id*. at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'"); *Virginia Panel Corp. v. MAC Panel Co*., 133 F.3d 860, 866 (Fed. Cir. 1997) ("[I]t is well-settled that device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent.").  To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms.  *Phillips*, 415 F.3d at 1323.

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors.  *Intel Corp. v. VIA Techs*., *Inc*., 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original).  When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms.  Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims.  *Vitronics Corp. v. Conceptronic*, *Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

**United States District Court**

For the Northern District of California

1    Dictionaries also may play a role in the determination of the ordinary and customary

2    meaning of a claim term.  The Federal Circuit recently reiterated that "[d]ictionaries or

3    comparable sources are often useful to assist in understanding the commonly understood

4    meanings of words . . . ."  *Phillips*, 415 F.3d at 1322.  The *Phillips* court, however, also

5    admonished that district courts should be careful not to allow dictionary definitions to supplant

6    the inventor's understanding of the claimed subject matter.  "The main problem with elevating

7    the dictionary to ... prominence is that it focuses the inquiry on the abstract meaning of the

8    words rather than on the meaning of claim terms within in the context of the patent."  *Id*. at

9    1321.  Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic

10   evidence.

11   In addition, a court has the discretion to rely upon prior art, whether or not cited in the

12   specification or the file history, but only when the meaning of the disputed terms cannot be

13   ascertained from a careful reading of the public record.  *Vitronics*, 90 F.3d at 1584.  Referring to

14   prior art may make it unnecessary to rely upon expert testimony, because prior art may be

15   indicative of what those skilled in the art generally understood certain terms to mean.  *Id.*

16       **B.      Claim Construction.**

17           **1.        "Protective coating"**

18   Claim 1 of the '198 Patent claims a corner bead for drywall construction comprising,

19   *inter alia*, "a thin [protective] coating on said front paper layer."  ('198 Patent, col. 4, l. 58.)[2]

20   USG proposes that the term "protective coating" be construed as:  "The material applied to the

21   front paper layer to reinforce the fibers and provide surface protection against abrasion."  Award

22   proposes that the term be construed as:  "Material that is applied to the outer surface of the front

23   paper layer and that guards against abrasion."  Each of the parties' proposed constructions of

24   this term attempts to describe the purpose or function of the "protective coating."

25   Although the claim language is silent on this point, the specification is not.  In the

26   Detailed Description of the Invention section, the patentee states that "a center band **16** of a

27   protective coating is applied to the outer face of the cover strip **12**, and a pair of bands **17** of a

28

---

    [2]      *See* note 1*, supra.*

protective coating is applied to the portions of the outer face of the cover strip **13** ... ." (*Id.*, col. 3, ll. 22-26.)  In the Summary of the Invention section, the patentee states that "[t]he portion of the paper layer covering and adjoining each shoulder is provided with a protective coating making it far more resistant to scuffing during the sanding operation in preparation for painting." (*Id.*, col. 2, ll. 18-23.)

As further set forth in the specification, "[t]he bands **16, 17** of protective coating preferably result from treatment of the outer paper layers **12, 13 (12', 13')** with a material which penetrates the fibers of the paper to reinforce the paper and provide surface protection against abrasion." (*Id.*, col. 3, ll. 43-47.)  The patentee also states that when the corner bead is sanded, "the protective bands **16, 17** prevent adverse scuffing of the paper **12** covering the corner rib **10***a* and the paper **13** covering the rounded nose **11***a* adjacent the shoulders **11***b*." (*Id.*, col. 4, ll. 24-28 (describing nail-on corner beads); *see also id.* at col. 4, ll. 41-43 ("the protective bands **16', 17'** prevent adverse scuffing of the outer paper layers **12', 13'**) (describing tape-on corner beads).)[3]

In light of the fact that the claim language is silent on the purpose of the "protective coating," the Court reads the claims "in view of the specification of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979).  It is evident from the specification that the protective coating is designed to reduce scuffing of the paper layer. Award argues that the Court should not construe this term to include the reference to reinforcing the fibers because that language refers only to a preferred embodiment.  USG argues that this language is not merely a preferred embodiment but is, in fact, a requirement of the invention.

Award is correct that, in general, the Court should not limit a claim term to the preferred embodiment.  *See Teleflex*, 299 F.3d at 1326; *accord Astrazeneca A.B. v. Mutual Pharmaceutical Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).  However, "the patentee's choice of preferred embodiments can shed light on the intended scope of the claims." *Astrazeneca*, 384 F.3d at 1340.  If the specification stated that the material penetrated the fibers of the paper

---

[3]     The terms "protective coatings" and "protective bands" are used interchangeably.  (*See, e.g.,* '198 Patent, col. 4, ll. 42-49.)

United States District Court

For the Northern District of California

*preferably* to reinforce the paper and provide surface protection against abrasion, Award's argument on this point would be more persuasive.  However, the term "preferably" modifies the entire phrase that it precedes.  (*See* '198 Patent, col. 3, ll. 43-47 ("[t]he bands of protective coating *preferably* result from treatment of the outer paper layers with a material that penetrates the fibers of the paper and provide surface protection against abrasion.") (emphasis added).)  Award concedes that in *all* embodiments the protective coating must penetrate the paper layer.

In the Court's view, and considering the context of the overall purpose of the protective coating, *i.e* to make the paper layer more resistant to scuffing during sanding, this language explains the import of the penetration limitation and the scope of the claims.  By penetrating the paper layer, the protective coating both reinforces the paper and provides surface protection against abrasion.  The Court is mindful that it should not read a limitation from the specification into the claims.  However, the Court does not concur with Award's view that the language discussed in the preceding paragraph refers only to a preferred embodiment but rather views this language as evidence that the patentee viewed that particular embodiment as important to the invention.  *See CCS Fitness*, 288 F.3d at 1367.  Therefore, reading the claims "in view of the specification of which they are a part," the Court construes the term "protective coating" to mean: **"The material applied to the front paper layer to reinforce said front paper layer and to provide surface protection against abrasion."**

> **2.     "[S]aid protective coating penetrating some of the fibers of said front paper layer and having a thickness on the front surface of said front paper layer of about 0.001 to 0.005 inches."**

This phrase also appears in claim one of the '198 Patent and further describes the protective coating limitation.  USG asks the Court to construe it as one phrase that means:  "The protective coating penetrates some of the fibers at the surface of the front paper layer and has a total thickness of about 0.001 to 0.005 inches, including the penetration depth."  Award asks the Court to construe the phrase in two parts as follows:  "(1) The protective coating enters some of the spaces between the fibers of the front paper layer;" and (2) "The protective coating has a

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  layer or film of about 0.001 to 0.005 inches adjoining, and measured from, the outer surface of

2  the front paper layer."

3        The parties agree that the protective coating penetrates the surface of the front paper

4  layer.  The Court concludes that no further construction of the term "penetrate" is required and

5  declines Award's request to parse the phrase to construe it.  The true dispute between the parties

6  rests on the construction of the thickness limitation.

7        As set forth above, USG contends that the "thickness" of the protective coating includes

8  any material that has penetrated into the surface of the paper layer.  USG argues that the

9  thickness must be measured to include material that has penetrated the paper because the patent

10  contemplates a unitary protective coating.  USG acknowledged, however, that at least some of

11  the protective coating acts as a barrier, *i.e.* there is some portion of the protective coating that

12  rests on the surface of the front paper layer.  Award contends that the "thickness" limitation

13  refers only to protective coating that rests above or on top of the surface of the paper layer.

14        Award's proposed construction is supported by the plain language of the claim.  The

15  claim language reads: "said protective coating ... having a thickness on the front surface of said

16  front paper layer of about 0.001 to 0.005 inches."  ('198 Patent, col. 4, ll. 61-64 (emphasis

17  added).)  USG argues that the term "on" refers to a location, *i.e.* the protective coating is located

18  "on" the front surface of said front paper layer.  However, the limitation in question refers to the

19  *thickness* of the protective coating and from where that thickness is to be measured.  The claim

20  language suggests that the thickness limitation is to be measured by excluding any of the

21  material that has penetrated into surface of the front paper layer.

22        The Court also reads the claims in light of the specification.  *Phillips*, 415 F.3d at 1315

23  (quoting *Markman*, 52 F.3d at 979).  The portion of the specification that describes the thickness

24  limitation reads as follows:  "When the coating has dried, the surface of the paper area to which

25  the coating material has been applied will normally have an acrylic *film or layer about 0.001*

26  *inches in thickness*."  ('198 Patent, col. 3, ll. 54-57 (emphasis added).)  The patentee also stated

27  that "[t]his *surface film or layer* can be increased in *thickness* to about 0.005 inches by using a

28  suitable primer sealer for the protective coating."  (*Id.*, col. 3, ll. 58-60 (emphasis added).)  Thus

8

the specification supports a conclusion that once the protective coating penetrates the surface of the paper layer and dries, it leaves a film or layer that forms a barrier on that surface, which can vary in thickness depending upon the type of material used.

Similarly, the drawings depict the bands of protective coating as lying on top of the paper layers, creating a barrier, and do not contradict the concept of a unitary protective coating because the drawings also show the penetration of the protective coating into the paper layers. (*See, e.g.,* '198 Patent, figs. 2, 4, 5, 6.)

Accordingly, the Court construes the term "said protective coating penetrating some of the fibers of said front paper layer and having a thickness on the front surface of said front paper layer of about 0.001 to 0.005 inches," to mean: **"The protective coating penetrates some of the fibers at the surface of the front paper layer and measures about 0.001 to 0.005 inches in thickness on the front surface of said front paper layer, said thickness excluding penetration depth of said protective coating."**

### CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms.  The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 within 21 days of the filing of this Order.

**IT IS SO ORDERED.**

Dated:  November 8, 2005

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California