**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES GYPSUM COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>PACIFIC AWARD METALS, INC.,<br><br>    Defendant.<br>_____/ | No. C 04-04941 JSW<br><br>**ORDER GRANTING PACIFIC AWARD METAL, INC.'S MOTION FOR SUMMARY JUDGMENT RE NON-INFRINGEMENT** |

## I. INTRODUCTION

This matter comes before the Court upon consideration of the motion for summary judgment filed by Defendant Pacific Award Metals, Inc. ("Award"). Having considered the parties' pleadings, relevant legal authority, and having had the benefit of oral argument, the Court HEREBY GRANTS Award's motion.

## II. BACKGROUND

In its motion, Award argues that Plaintiff United States Gypsum, Inc. ("USG") is estopped from claiming that Award's accused products infringe U.S. Patent No. 5,131,198 (the "'198 Patent") under the doctrine of equivalents because of prosecution history estoppel.[1]

---

[1] In light of the Court's ruling on the issue of prosecution history estoppel, the Court does not reach Award's alternative argument that to apply the doctrine of equivalents in this case would violate the "all elements rule."

A.     **Procedural History.**

On November 19, 2004, USG filed this infringement action. On September 19, 2005, the Court granted USG's unopposed motion to amend the complaint to bring claims for trade secret misappropriation and inducement of breach of contract against two former employees, in addition to USG's allegations of infringement. According to USG, Award's accused products infringe claims 1-4 and claim 7 of the '198 Patent. (*See* Plaintiff's Final Infringement Contentions at 2.)[2]

On November 2, 2005, the Court held a hearing to construe the two disputed claim terms of the '198 Patent.[3] On November 8, 2005, the Court issued its Claim Construction Order. In that Order, the Court construed the term "protective coating" to mean "[t]he material applied to the front paper layer to reinforce said front paper layer and to provide surface protection against abrasion." (Claim Construction Order at 7:17-18.) The Court construed the phrase "said protective coating penetrating some of the fibers of said front paper layer and having a thickness on the front surface of said front paper layer of about 0.001 to 0.005 inches" to mean[4]: "The protective coating penetrates some of the fibers at the surface of the front paper layer and measures about 0.001 inches to 0.005 inches in thickness on the front surface of said front paper layer, said thickness excluding penetration depth of said protective coating." (*Id*. at 9:10-13.) The Court's construction of the thickness limitation of the latter phrase gives rise to Award's motion for summary judgment.

---

[2]   Attached as Exhibit 21 to the Declaration of Colbern C. Stuart III ("Stuart Decl.") in Support of Award's motion for summary judgment.

[3]   *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

[4]   The Court hereinafter refers to first portion of this phrase (*i.e.* "penetrating some of the fibers of said front paper layer ") as the "penetration limitation." The Court hereinafter refers to the second portion of this phrase (*i.e.* "having a thickness on the front surface of said front paper layer of about 0.001 to 0.005 inches") as the "thickness limitation."

**B.    Factual Background.**

The facts pertaining to the prosecution history of the '198 Patent are not disputed. Rather, the parties dispute the legal implications of those facts. The '198 Patent relates to corner beads for drywall construction and particularly to corner beads having an outer paper layer. ('198 Patent, col. 1, ll. 9-11.)[5] The '198 Patent is a continuation-in-part of Application No. 07/541,894, filed on June 21, 1990, directed to an "Improved Corner Bead for Drywall Construction" (hereinafter the "Parent Application").[6]

Claim 1 of the '198 Patent reads, in pertinent part:

> A corner bed [*sic*] for drywall construction, comprising:
>
> ...
>
> a thin protected [*sic*] coating on said front paper layer at said should [*sic*] portions and an adjoining portion of said central portion along the length of said core strip, said protective coating penetrating some of the fibers of said front paper layer and having a thickness on the front surface of said front paper layer of about 0.001 to 0.005 inches,
>
> ... said protective coating being substantially more resistant to abrasive action than joint cement.

('198 Patent, col. 4, ll. 51-68, col. 5, ll. 1-4.)

**1.    The pertinent portions of the claims and specification of the Parent Application.**

Claim 1 of the Parent Application reads:

> A corner bead for drywall construction comprising:
>
> a core strip having a central portion, two side flanges extending laterally at about a right angle relative to one

---

[5]  The '198 Patent is attached as Exhibit 1 to the Stuart Declaration and as Exhibit 1 to the Declaration of Michael P. Padden in Support of United States Gypsum's Opposition to Defendant's Motion for Summary Judgment ("Padden Decl.").

[6]  Award has attached the Parent Application and continuation-in-part application ("CIP Application"), which issued as the '198 Patent, as Exhibits 6 and 5, respectively, to the Stuart Declaration. USG in turn has attached the Parent Application and the CIP Application as Exhibits 3 and 2, respectively, to the Padden Declaration. Unless it is necessary for the Court to identify a particular party's submission to establish that the party has met its burden of proof, the Court hereafter cites to the prosecution history of the '198 Patent by the identifying Bates Number.

>   another, and respective shoulders joining said central
>   portion and said side flanges;
>
>   a front paper layer covering the outer face of said core strip
>   and bonded thereto; and
>
>   *a protective coating on said front paper layer* positioned to
>   overlie said shoulders and an adjoining portion of said
>   central portion along the length of said core strip.

(USG 00132, emphasis added.)

In the "Summary of Invention" section of the Parent Application, the inventors made clear that their corner bead included a protective coating that was resistant to scuffing during sanding. (*See* USG 00128 ("[t]he present invention provides an improved nail-on corner bead having advantages of tape-on beads, but not the scuffing disadvantage, and which can be produced economically"), USG 00129 ("paper layer is provided with a protective coating making it [the paper layer] far more resistant to scuffing during the sanding operation in preparation for painting. The protective coating has a composition to which paint will readily adhere."), USG 00131 ("[w]hen the spackle or joint is later sanded the protective bands 16, 17 prevent adverse scuffing of the paper 12 covering the corner rib 10a and the paper 13 covering the rounded nose 11a adjacent the shoulders").)

In the "Detailed Description of the Invention," with respect to the protective coating, the inventors stated:

>   [i]n accordance with the present invention a center band 16
>   of a protective coating is applied to the outer face of the
>   cover strip 12, and a pair of bands 17 of a protective
>   coating is applied to the portions of the outer face of the
>   cover strip 13 which cover the pair of shoulders 11b and are
>   adjacent thereto. ... *The bands 16, 17 of protective coating
>   may comprise a fine particle size, acrylic water-based
>   emulsion such, for example, as Synthemul® synthetic resin
>   emulsion 40-423, produced by Reichhold Chemicals, Inc.,
>   Dover Delaware, diluted with 50% water.*

(USG 00130-131, emphasis added.)

In the "Brief Description of the Invention," in relation to the figures, the inventors state that "the thickness of the elements" is "exaggerated for illustrative purposes." (USG 00129.)

4

Those "elements" include the bands 16, 17 of protective coating, discussed above. (USG 00135, Figs. 2, 4.)

### a. First Office Action and Rejection.

On November 7, 1990, the United States Patent and Trademark Office Examiner (the "Examiner") rejected each of the claims of the Parent Application as being anticipated or rendered obvious by prior art references Dunlap (the "Dunlap reference"), Cooper and Miller. (USG 00151-158.) Specifically, the Examiner stated with respect to the Dunlap reference, that "Dunlap discloses a shoulder bead for use in drywall construction comprising a core strip 5, a front paper layer 6, and a protective coating 13 which consists of two bands one covering each face of the corner." (USG 00152.) The Examiner also rejected claim 7, which recited "[a] corner bead according to claim 1 in which said protective coating contains fine acrylic particles" because "Dunlap as noted in the rejection of claim 1 sets forth all of the elements of claim 7 except for specifying that the protective coating layer 13 contain fine acrylic particles. This would have been an obvious design choice to one having ordinary skill in the art because the use of acrylic particles as a protective means is well known in the art, ie [*sic*] acrylic paints." (USG 00154-55.)

### b. Response to First Office Action.

In response to this Office Action, the inventors amended, *inter alia*, claim 1 as follows:

> a protective coating <u>other than joint cement</u> on said front paper layer [positioned to overlie] <u>at</u> said <u>shoulder portions</u> [shoulders] and an adjoining portion of said central portion along the length of said core strip, <u>said shoulder portions, front paper layer, and protective coating collectively providing outer exposed shoulders so that joint cement or the like can be applied over the paper-covered flanges and dressed to said exposed shoulders after the corner bead is applied to a drywall corner, said protective coating being substantially more resistant to abrasive action than joint cement.</u>

5

(USG 00161-62, as in original, with bracketed language indicating deletions and underscored language indicating additions.)[7]

When the inventors set forth their arguments for allowance, they distinguished the Dunlap reference as follows:

> Dunlap's material 13 is joint cement and is not a "protective coating" in the sense that this term is used in the claims. Applicants' protective coatings 16, 17 are applied <u>before</u> the corner bead is mounted on a drywall corner so that when the corner bead is later used and joint cement has been spread from the wall surface onto the corner bead, the subsequent sanding operation will not scuff the exposed portion of the outer paper layer. If a preliminary coating of joint cement is applied to the outer paper layer it will not serve as a protective layer during a sanding operation performed after a second coating of joint cement is applied over the preliminary coating. This is self evident in view of the fact that the abrasive material which is selected to smooth the corner bead is designed to remove excess joint cement. Dunlap does not disclose or suggest applicants' claimed invention.

(USG 00163, emphasis in original.)  Thus, the inventors explained that "[c]laims 1 and 9 have been amended to distinguish the recited protective *layer* from the joint cement applied after the corner bead is mounted." (*Id.*, emphasis added.)

In response to the Examiner's obviousness rejection of claim 7, the inventors argued that "there is no teaching in the corner bead art of the application of acrylic paints as a protective coating for the purposes taught by applicants. In fact, none of the prior art (including Dunlap) teaches application to the outer paper layer on a corner bead of a *protective layer* more resistant to abrasive action than joint cement." (USG 00164, emphasis added.)

      **c.**    **Final Rejection and Examiner Interview.**

On February 27, 1991, the Examiner issued an Office Action in which he again rejected each of the claims of the Parent Application. That rejection was made final. (USG 00170-79.)

---

[7] The inventors made substantially similar amendments to the protective coating limitation of claim 9. Because the Court finds that claim 1 of the Parent Application evolved into claim 1 of the '198 Patent, and because claim 1 of the '198 Patent is representative of the claims at issue, the Court focuses its discussion on the evolution of that claim.

6

The Examiner rejected claims 1 and 7 as being rendered obvious in light of the Dunlap reference and a new reference, Tucker (the "Tucker reference"):

> Dunlap provides a corner bead for drywall construction comprising a core strip 5, a front paper layer 7, and a protective coating 13. What Dunlap does not provide or suggest is making the protective coating something other than joint cement. Tucker teaches using a flexible elongated plastic bead, substantially more resistant to abrasive action than joint cement, secured to the outer face of a core strip so that joint cement or the like can be applied after the corner bead is applied to a drywall corner to provide a distinct and protected corner. Tucker also discloses that the plastic bead could be formed of acrylic, stryrene, or polyvinyl chloride plastic, as well as other flexible plastic materials. To have modified the corner bead of Dunlap by providing the acrylic protective coating of Tucker would have been obvious to one having ordinary skill in the art at the time of the invention to provide a more distinct and protected corner.
>
> ...
>
> It is noted that the applicant's [*sic*] do not contend the structure of their drywall bead to be new but that the crux of their invention lies in the protective coating which is newly claimed to be a material other than joint cement. However, the new reference, Tucker, discloses a teaching of plastic protective coating that functions the same as applicant's coating and could readily be adapted to known drywall corner bead structures.

(USG 00171-72, 177.)

On April 30, 1991, the inventors' attorney conducted an interview with the Examiner. According to the Examiner Interview Summary Record, prior art corner beads and the inventors' corner beads were shown to the examiner and the parties "discussed different possible approaches to claim film on bead and possibly get by Tucker reference." (USG 00180.)

On October 3, 1991, the Examiner issued a Notice of Abandonment of the Parent Application. (USG 00185.)

**2.    The pertinent portions of the specification and claims of Application No. 07/750,047 (the "CIP Application").**

On August 27, 1991, after the Examiner's interview but before the Parent Application was abandoned, the inventors filed the CIP Application. (USG 00001.) Claim 5 of the CIP Application, which issued as claim 1 of the '198 Patent reads, in pertinent part:

7

> A corner bead for drywall construction, comprising:
>
> ...
>
> a <u>thin</u> protective coating [other than joint cement] on said front paper layer at said should [*sic*] portions and an adjoining portion of said central portion along the length of said core strip, <u>said protective coating penetrating some of the fibers of said front paper layer and having a thickness on the front surface of said front paper layer of about .001 to .005 inches,</u>
>
> said shoulder portions, front paper layer, and protective coating collectively providing outer exposed shoulders so that joint cement or the like can be applied over the paper-covered flanges and dressed to said exposed shoulders after the corner bead is applied to a drywall corner, said protective coating being substantially more resistant to abrasive action than joint cement.

(USG 00013-14, as in original with brackets indicating deletions and underscored language indicating additions.)

In the Summary of the Invention section of the CIP Application's specification, the inventors again reiterated that their corner bead provided a solution to the problem of scuffing arising during the sanding process.  (*See* USG 00007-09.)  In the Detailed Description of the Invention, the inventors stated:

> The bands 16, 17 of protective coating *preferably result from treatment of the outer paper layers ... with a material which penetrates the fibers of the paper to reinforce the paper and provide surface protection against abrasion. For example, the coating material for the bands 14 15* may comprise a fine particle size, acrylic, water-based emulsion such, for example, as Synthemul® synthetic resin emulsion 40-423, produced by Reichold Chemicals, Inc., Dover Delaware, diluted 50% with water. *This material may be applied by a brush, roller or spraying apparatus.  When the coating has dried, the surface of the paper area to which the coating material has been applied will normally have an acrylic film or layer about .001 inches in thickness. This surface film or layer can be increased in thickness to about .005 inches using a suitable primer sealer for the protective coating.  For example, the same acrylic resin can be utilized with the following additional ingredients: [ingredient list omitted].  A typical cellulosic thickener is Natrosol 250 HR solution (1 1/2%).*

(USG 00010-11, emphasis added to show language added to specification.)  The inventors also added the following language to the specification:

> It will be appreciated that the thickness of the protective coatings 16, 17 have been somewhat exaggerated in the drawings for illustrative purposes. The portions of the outer paper layer in figures 2, 4, 5 and 6 adjoining the protective coatings 16, 17 have been dotted to indicate impregnation of the paper by the coating material.

(USG 00012.)

On December 13, 1991, the Examiner issued a Notice of Allowability, which references the August 27, 1991 interview held in conjunction with the Parent Application. (USG 00031.) The Examiner's Statement of Reasons for Allowance included the statement that "none of the prior art teaches or suggests a protective coating on a drywall corner bead which penetrates some of the fibers of the frontmost paper layer to help resist scuffing of abrasive action." (USG 00033.) In reference to prior art of record "for showing the state of the art of drywall corner beads," the Examiner stated "[n]otice particularly Tucker which teaches a protective coating however the protective coating of Tucker is glued on and does not penetrate the fibers of the paper layer." (*Id.*)

### III.  ANALYSIS

**A.   Evidentiary Rulings.**

Award moves to strike paragraphs 5 and 15-22 of the Declaration of Charles Klass, filed in support of USG's opposition to the motion for summary judgment, on the ground that USG has failed to produce documents underlying the opinions set forth in those paragraphs. Award, however, fails to demonstrate why these documents were necessary to adequately respond to USG's opposition. Moreover, for reasons discussed later in this order, the Court does not consider these documents material to the resolution of this motion. Accordingly, Award's motion to strike paragraphs 5 and 5-12 of the Klass Declaration is DENIED.

Award also moves to strike paragraphs 10-13 of the Klass Declaration, on the ground that the testimony set forth therein is based upon testimony that is purely speculative and, thus, not based upon information that would be reasonably relied upon by an expert. Accordingly, Award contends that the Klass Declaration lacks an adequate evidentiary foundation and should be excluded. In response, USG notes that the testimony on which Mr. Klass relied is the testimony of Award's own witnesses, whom Award contends are persons of ordinary skill in the art and includes

9

testimony that Award relies upon in support of its contention that thinner *coatings* would have been foreseeable. (*See* Award Mot. at 19:3-7; Klass Decl., ¶ 11 at 5:9-11.) Because the Court concludes the conclusions set forth by Mr. Klass based upon the testimony in question are immaterial to the resolution of this motion, it also DENIES Award's motion to strike these paragraphs.

Finally, with its Reply Brief, Award submitted a declaration from Colbern C. Stuart, III ("Stuart Reply Declaration"), attached to which are numerous documents that Award contends rebut one statement in the Klass Declaration. In response, USG sought leave to file a supplemental Declaration from Mr. Klass, in which Mr. Klass comments on the attachments to the Stuart Reply Declaration. USG asks that if the Court does not accept the Supplemental Klass Declaration, that it also not consider the Stuart Reply Declaration. The Stuart Reply Declaration is not necessary to resolution of this motion and has not been considered by the Court. Accordingly, USG's motion for leave to file the Supplemental Klass Declaration is DENIED AS MOOT.

**B.      Legal Standards Applicable to Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248.

1    If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party either must produce evidence which negates an essential element of the non-moving party's claims or must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**C.     Legal Standards Applicable to the Merits of Award's Motion.**

**1.     Infringement Analysis.**

There are two steps in an infringement analysis: (1) construing the claims of the patent in suit; and (2) comparing the properly construed claims to the accused products. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). In order to demonstrate that an accused product infringes, a plaintiff must show "'the presence of every element or its substantial equivalent in the accused device." *Terlep v. Brinkman Corp.*, 418 F.3d 1379, 1384 (Fed. Cir. 2005) (quoting *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994)). USG concedes that, based upon the Court's construction of the thickness limitation, Award's accused products do not literally infringe the asserted claims of the '198 Patent. Award now asks the Court to find as a matter of law that USG cannot argue infringement by equivalents because it is estopped from doing so.

**2.     The Doctrine of Equivalents.**

The temporary monopoly granted a patent holder is, at heart, a property right,

> and like any property right, its boundaries should be clear.
> ... A patent holder should know what he owns, and the
> public should know what he does not. ... Unfortunately, the
> nature of language makes it impossible to capture the
> essence of a thing in a patent application. The inventor
> who chooses to patent an invention and disclose it to the

11

> public, rather than exploit it in secret, bears the risk that others will devote their efforts toward exploiting the limits of the patent's language. ...
>
> The language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying. For this reason, the clearest rule of patent interpretation, literalism, may conserve judicial resources but is not necessarily the most efficient rule. The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, Co., Ltd.*, 535 U.S. 722, 730-32 (2002) ("*Festo VIII*").

Thus, "[t]he doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Id.* at 733. However, while a patentee is entitled to argue that an accused device is equivalent to his or her claimed invention, the ability to argue infringement by equivalence is not without limitations.

### 3. The Doctrine of Prosecution History Estoppel.

In *Festo VIII*, the Supreme Court noted that the application of the doctrine of equivalents necessarily "renders the scope of patents less certain." *Id.* at 732. "Estoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.'" *Id.* at 733 (quoting *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-221 (1940)). The doctrine of prosecution history estoppel therefore works to achieve a balance between a patentee's right to claim infringement by equivalents and the public's right to know the scope of a patent. If a "patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforseen subject matter that should be deemed equivalent to the literal claims of the issued patent." *Id.* at 733-34; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, Co., Ltd.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) ("*Festo IX*").

Under the teachings of *Festo VIII* and *Festo IX*, prosecution history estoppel applies where an amendment during prosecution narrowed the literal scope of a claim. *Festo IX*, 344 F.3d at 1366. "If the amendment was not narrowing, then prosecution history estoppel does not apply." *Id.* If, however, an "accused infringer establishes that the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability." *Id.* If the answer to this question is yes, a presumption arises that the patentee has "surrendered all territory between the original claim limitation and the amended claim limitation." *Id.* at 1367 (citing *Festo VIII*, 535 U.S. at 740). "The standard for determining whether particular subject matter was relinquished is an objective one that depends on what a competitor reasonably would conclude from the patent's prosecution history." *Mark I Marketing, Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed. Cir. 1995); *cf. Festo IX*, 344 F.3d at 1369.

The party asserting prosecution history estoppel has the burden to establish that a patentee made a narrowing amendment. If that party meets his or her burden, and the presumption of surrender arises, the burden then shifts to the patentee to rebut the presumption of surrender by demonstrating that: (1) an alleged equivalent was not foreseeable at the time of the amendment; (2) the rationale underlying the narrowing amendment bears no more than a tangential relationship to the equivalent in question; or (3) "'some other reason suggestion that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Festo IX*, 344 F.3d at 1369-70 (citing and quoting *Festo VIII*, 535 U.S. at 738, 740-41.)

"Issues relating to the application and scope of prosecution history estoppel, including whether the presumption of surrender of subject matter has arisen and whether it has been rebutted, are questions of law to be decided by the court." *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) (citing *Festo IX*, 344 F.3d at 1368). Furthermore, although rebuttal of the presumption of surrender may involve factual questions, because those questions pertain to legal issues, the Court can resolve such factual issues on summary judgment. *See Festo IX,* 344 F.3d at 1368 & n.3; *Biagro*, 423 F.3d at 1305.

**D.   USG Is Estopped From Claiming Infringement Under the Doctrine of Equivalents.**

When a court is confronted with the assertion that a patentee is barred from claiming infringement by equivalents on the grounds of prosecution history estoppel, a court must determine "which claim elements are alleged to be met by equivalents." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558, 586 (Fed. Cir. 2000); *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("[T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."). In this case, the "invention as a whole" is a corner bead for drywall construction. ('198 Patent, col. 4, l. 51.) Although many of the parties' arguments focus on the "protective coating" limitation, the alleged equivalent element pertains to the thickness limitation. Thus, the question presented to the Court is whether USG surrendered territory outside the literal scope of the claims, *i.e.* thicknesses outside the range of 0.001 to 0.005 inches.

**1.   USG Made Narrowing Amendments Related to Patentability.**

USG asserts that it cannot have made a narrowing amendment because "claims can be amended only when the amendments have support in the specification of which they are a part." (Opp. Br. at 9.) USG also asserts that "the CIP claim containing the thickness limitation was drawn from new matter in the CIP specification which described a penetrating coating," and that without the new matter added in the the CIP "the thickness language at issue here could not have been added to the claim because it would have had the required support in the specification." (Opp. Br. at 9; *see also* Tr. at 11, 22-22.) The Court is not persuaded by USG's argument.

To determine whether USG made a narrowing amendment, this Court examines the entire prosecution history of the '198 Patent, including the Parent Application. *See Mark I*, 66 F.3d at 291. "[A] narrowing amendment may occur when either (1) a preexisting claim limitation is narrowed by amendment or (2) a new claim limitation is added by amendment. ... Either amendment will give rise to a presumptive estoppel if made for a reason related to patentability." *Honeywell, Int'l v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1140 (citing *Warner-Jenkinson*, 520 U.S. at 33 and *Festo VIII*, 535 U.S. at 728).

The Court finds the *Mark I* case to be on point. In that case, the patentees' initial claims were rejected over prior art on the grounds of obviousness and anticipation. *Mark I*, 66 F.3d at 290. Rather than responding to these rejections, the patentees filed a continuation-in-part application, which contained new and narrower claims. *Id.* These claims also were rejected, despite the patentees' attempts to distinguish the narrower claims over the prior art. *Id.* at 290-91. Once again, instead of responding to the rejections, the patentees filed another continuation-in-part application with new and narrower claims containing the limitation covering the alleged equivalent. *Id.* at 291. Those claims were allowed without comment. *Id.* In determining that the doctrine of prosecution history estoppel applied to bar the plaintiff from claiming infringement by equivalents, the Federal Circuit found it immaterial that the claims of the second continuation-in-part had not been rejected or amended. What was important was the fact that the plaintiff "chose to file continuing applications with successively narrower claims in lieu of otherwise responding to the PTO's rejections." *Id.* at 292.

In this case, the inventors initially submitted a broad claim for a corner bead comprising, *inter alia*, "a protective coating on said front paper layer." (USG 00132.) When that claim was rejected in light of prior art, the inventors amended, and narrowed, the claim by adding the limitations that the protective coating be something "other than joint cement" and that it be "substantially more resistant to abrasive action than joint cement." (USG 00162.) Thereafter, and throughout the prosecution history, in arguing for allowance, the inventors noted that a key aspect of their corner bead invention was a protective *layer* against surface abrasion.

For example, after the first rejection the inventors stated "Claims 1 and 9 have been amended to *clearly distinguish the recited protective layer* from the joint cement applied after the corner bead is mounted." (*Id.*, emphasis added.) In arguing for allowance of dependent claim 7 of the Parent Application, the inventors further argued that "none of the prior art (including Dunlap) teaches application to the outer paper layer on a corner bead of a protective *layer* more resistant to abrasive action than joint cement." (USG 00164, emphasis added.) Similarly, after the Examiner rejected the claims in light of the Tucker reference, the inventors did not respond to that rejection. Rather, the inventors filed the CIP application and again narrowed the scope of the claims by

adding further limitations, including the thickness limitation. (*See* USG 00013-14.) Once again, in the specification the inventors discussed the fact that there would be a "film or layer" on the surface of the front paper layer. (*See, e.g.,* USG 00009-12.) Although it is true that the Parent Application did not claim a particular range of thickness for this film or layer, common sense dictates that a "layer" necessarily would have some degree of thickness.

Thus, the Court rejects USG's argument that the addition of the thickness limitation cannot be considered a "narrowing amendment" merely because it was included for the first time in the CIP application. "[E]stoppel cannot be avoided by failing to respond to a rejection and instead meeting the substance of the rejection by filing a narrower continuing application." *Mark I*, 66 F.3d at 292. Like the patentees in the *Mark I* case, USG "chose to file continuing applications with successively narrower claims" in order to obtain allowance, and the fact that the claims of the CIP application were not amended or rejected is of no moment. *See id*.

The question now becomes whether that amendment was made for a reason related to patentability. *Festo IX*, 344 F.3d at 1366-67. In making this determination, the Court is limited to consideration of the prosecution history. In *Festo IX* the Federal Circuit held that "a narrowing amendment made to comply with *any provision* of the Patent Act, including § 112, may invoke an estoppel." *Festo IX*, 344 F.3d at 1366-67 (emphasis added). Award contends that the prosecution history demonstrates that the thickness limitation was added to overcome the Tucker reference. However, the Tucker reference would have encompassed a layer or film of protective coating on the front surface of the front paper layer of any thickness and, thus, adding the thickness limitation did nothing to distinguish the invention over Tucker. The Court's conclusion on this point is supported by consideration of the Examiner's statement of reasons for allowance, which distinguished Tucker by way of the penetration limitation. (USG 00033.)

USG argues that the thickness limitation was not added to satisfy the definiteness requirement of 35 U.S.C. § 112, ¶ 2, or to satisfy the requirements of 35 U.S.C. § 101. However, the inventors made clear throughout the prosecution history that the protective coating formed a film or layer on the surface of the paper layer to protect against abrasion, which is encompassed by the thickness limitation, and that this was an important feature of their invention. Based on the

16

United States District Court

For the Northern District of California

prosecution history, the Court concludes that the thickness limitation was added for reasons related to patentability.

Accordingly, the Court concludes that Award has established that the *Festo* presumption of surrender arises in this case, shifting the burden to USG to rebut that presumption. *Festo IX*, 344 F.3d at 1367.

### 2.  USG Has Not Rebutted the *Festo* Presumption of Surrender.

USG argues that it can rebut the *Festo* presumption because the alleged equivalent, *i.e.* a thickness on the front surface of the front paper layer of less than about .001 to .005 inches, was not foreseeable at the time of the amendment. The question of whether the *Festo* presumption has been rebutted on the grounds that the alleged equivalent was unforeseeable at the time of the amendment "presents an objective inquiry, asking whether the alleged equivalent would have been unforeseeable to one of ordinary skill in the art at the time of the amendment." *Festo IX*, 344 F.3d at 1369. In *Festo IX*, the Federal Circuit noted that an equivalent that represented "later developed technology ... or technology that was not known in the relevant art," the alleged equivalent would not have been foreseeable, whereas an equivalent that was known in the prior art in the field of the invention should have been foreseeable. *Id.*[8] The Court can consider evidence extrinsic to the prosecution history, including expert testimony, in its effort to determine whether the alleged equivalent was or was not foreseeable and, as noted, can resolve any factual disputes. *Id.* at 1368 & n.3; *Biagro*, 423 F.3d at 1305.

USG proffers the Declaration of Charles Klass, a putative expert on paper making and paper coatings, to show that the thickness limitation was not foreseeable at the time of the amendment. The conclusions in Mr. Klass's declaration are based on testimony from Mr. Wesley Dunham, who was involved in the development of the protective coating on USG's corner beads, and a literature search. The substance of Mr. Dunham's deposition testimony is that coating *materials* changed dramatically and got thinner and better and the "material itself provided better

---

[8]  USG also relies on the second criterion set forth in *Festo IX*, namely that the narrowing amendment bears no more than a tangential relation to patentability. For the reasons set forth in Section III.D.1, the Court finds USG has not met its burden to show the narrowing amendment was tangential.

17

resistance to the sanding." (*See, e.g.,* Padden Decl., Ex. 6 at 94:15-95:23, 160: 3-9; Ex. 7 at 16:10-18:23.) Similarly, Mr. Klass' literature search appears to have focused on whether there was an equivalent *protective coating*. Mr. Klass avers that his literature search revealed no results for *coatings* that "would provide resistance to abrasion by sanding." (*See* Klass Decl., ¶¶ 16-21.) Thus, Mr. Klass concluded that because the coatings got better and because there were no *coatings* disclosed in the literature search that were resistant to abrasion, someone skilled in the art could not have foreseen a thinner film or barrier on the front surface of the front paper layer.

Ultimately, in determining whether a patentee has overcome the *Festo* presumption of surrender, the Court must ask whether "at the time of the amendment one skilled in the art could not reasonably have been expected to have drafted a claim that would literally have encompassed the *alleged equivalent*." *Festo VIII*, 535 U.S. at 741 (emphasis added). The evidence put forward by USG in Mr. Klass's declaration pertains to the protective coating limitation of the '198 Patent, *i.e.* the *material* from which that protective coating was or is now made. This evidence does not, however, address the alleged equivalent, *i.e.* the thickness limitation. In asking whether the inventors "could not reasonably have been expected to draft a claim that would literally have encompassed the alleged equivalent," it is the thickness limitation which must be the focus of the Court's inquiry.

USG argues that because the CIP Application disclosed a penetrating coating, the inventors were merely drafting language that encompassed their empirical knowledge about the formulations of protective coatings. However, both the Parent Application and the CIP Application disclosed Synthemul diluted with 50% water as material that could be used as the protective coating and would penetrate the front surface of the front paper layer. (USG 000131; Stuart Decl., Ex. 10, ¶ 7.) The entire prosecution history of the '198 Patent demonstrates that a film or layer of protective coating remain on the surface of the front paper layer. (*See, e.g.,* USG 00007-11, 128-132, 161-64.) The claims of the Parent Application, which the inventors stated required a protective layer, were drafted without any reference to the dimensions of that layer. Thus, although the coating *material* may indeed have improved over time, there is no evidence in the record from which the Court could find the inventors could not have drafted a claim that would literally have

18

encompassed the alleged equivalent, *i.e.* a film or layer outside the range of 0.001 to 0.005 inches in thickness.

Accordingly, the Court concludes that USG has not met its burden to rebut the *Festo* presumption and, therefore, USG is barred from asserting infringement by equivalents.

## CONCLUSION

For the foregoing reasons, Award's motion for summary judgment is GRANTED. In light of this ruling, and the impact it will have on the structure of the case going forward, the parties shall appear for a further case management conference on April 14, 2006. A case management conference statement shall be due on April 7, 2006. The parties shall be prepared to address ADR options at that time.

**IT IS SO ORDERED.**

Dated: March 1, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE