1

2

3

4

5          **NOT FOR CITATION**

6

7          IN THE UNITED STATES DISTRICT COURT

8

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10     UNITED STATES GYPSUM COMPANY,

11          Plaintiff,                          No. C 04-04941 JSW

12     v.                                       **ORDER GRANTING UNITED**
                                                **STATES GYPSUM COMPANY'S**
13     PACIFIC AWARD METALS, INC.,              **MOTION FOR SUMMARY**
                                                **JUDGMENT RE NON-**
14          Defendant.                          **INFRINGEMENT**

15
                                        /
16

17                              **INTRODUCTION**

18          This matter comes before the Court upon consideration of the motion for summary

19     judgment filed by Plaintiff United States Gypsum Company ("USG").  Having considered the

20     parties' pleadings, relevant legal authority, and having had the benefit of oral argument, the

21     Court HEREBY GRANTS USG's motion.

22          In its motion, USG argues that it is entitled to judgment as a matter of law on the false

23     marking counterclaim filed by Defendant Pacific Award Metals, Inc. ("Award") with respect to

24     U.S. Patent No. 5,131,198 (the "'198 Patent"), which relates to corner beads for drywall

25     construction and particularly to corner beads having an outer paper layer.[1]

26

27

28
       _____

       [1]     Award has stated that it will withdraw its counterclaim for unfair competition.
       Pursuant to that representation, Award is directed to file a dismissal of that counterclaim
       within five days of the date of this Order.

**BACKGROUND**

A.   **Procedural Background.**

On November 19, 2004, USG filed this infringement action alleging that Award infringed the '198 Patent.  On December 20, 2004, Award answered and filed a counterclaim for, *inter alia*, false marking.  In its counterclaim, Award alleged that USG falsely marked its products with the '198 Patent when USG "knew the protective coating on its paper-faced corner bead products has a thickness that, as measured from the surface of the paper to the top of the protective coating, is substantially less than 0.001 inches."  (Declaration of Thomas W. Jenkins ("Jenkins Decl."), Ex. 10 at p. 11, ¶ 21.)

On November 2, 2005, the Court held a hearing to construe the two disputed claim terms of the '198 Patent.  At that hearing, Award contended that the thickness of the protective coating should exclude any protective coating that penetrated the surface of the front paper layer.  USG argued to the contrary and claimed that the thickness of the protective coating should include protective coating that penetrated the surface of the front paper layer.

On November 8, 2005, the Court issued its Claim Construction Order, in which it rejected USG's proposed construction of the thickness limitation.  The Court construed the disputed term to mean:  "The protective coating penetrates some of the fibers at the surface of the front paper layer and measures about 0.001 inches to 0.005 inches in thickness on the front surface of said front paper layer, said thickness excluding penetration depth of said protective coating."  (Claim Construction Order at 9:10-13.)

USG conceded that, under the Court's construction, Award's products did not literally infringe the '198 Patent but maintained that Award's products infringed under the Doctrine of Equivalents.  USG also continued to mark its paper-faced corner bead products with the '198 Patent.  (Declaration of Val Perrine ("Perrine Decl."), ¶ 13; Jenkins Decl., Ex. 5 (Perrine Depo. at 591:24-592:18).)

On March 1, 2006, the Court granted Award's motion for summary judgment and found that the doctrine of prosecution history estoppel precluded USG from claiming infringement by

*United States District Court*

*For the Northern District of California*

2

1    equivalence.  Following that Order, USG stopped marking its nose coated paper-faced corner

2    bead products with the '198 Patent.  (Perrine Decl., ¶ 13.)

3        **B.    Factual Background.**

4        The following facts are undisputed.  The '198 Patent was issued on July 21, 1992 to

5    inventors James Ritchie and Don King and was assigned to their employer BeadeX.  (Jenkins

6    Decl., Ex. 1.)  After the '198 Patent issued, BeadeX began to mark its nose coated paper-faced

7    corner bead products with the '198 Patent.  (Jenkins Decl., Ex. 2 (Ritchie Depo at 27:21-28:1).)

8    At some point thereafter, BeadeX began to outsource the coating process and discovered that the

9    protective coating applied by its vendor to the nose coated paper-faced corner bead products

10   measured less than 0.001 inches above the surface of the paper.  (Declaration of Craig Radford

11   ("Radford Decl."), ¶ 3; Declaration of Wesley Dunham ("Dunham Decl."), ¶ 7.)[2]

12   Notwithstanding this discovery, BeadeX continued to mark these products with the '198 Patent.

13       In approximately 1994, USG entered into a relationship with BeadeX whereby BeadeX

14   supplied USG with nose coated paper-faced corner beads to be sold under USG's private labels.

15   Those products were marked with the '198 Patent.  (Perrine Decl., ¶ 4-7; Jenkins Decl., Ex. 5

16   (Perrine Depo. at 232:6-12, 232:20-233:4).)  USG eventually acquired BeadeX for

17   approximately $75 million.  After the acquisition, USG continued to place the '198 Patent on its

18   nose coated paper-faced corner bead products and, as noted above, continued to do so until after

19   the Court granted summary judgment in favor of Award on the Doctrine of Equivalents issue.

20   The Court addresses additional facts in its analysis.

21

22

23

24

25       [2]      Mr. Radford was the operations manager at BeadeX and then at USG from
26   1993 through 2000.  (Radford Decl., ¶ 1.)  Mr. Radford was Mr. Dunham's supervisor.

27       Mr. Dunham worked at BeadeX and USG from April 1969 through August 2003.
     (Jenkins Decl., Ex. 4 (Dunham Depo. V. 1 at 9:12-10:11.).)  From 1985 through 1995, Mr.
28   Dunham was the Supervisor of Maintenance and Production for the BeadeX nose coated
     paper-faced corner bead products.  (Dunham Decl., ¶ 2.)  Thereafter, Mr. Dunham was a
     Technical Manager for new product development at BeadeX and then at USG.  (*Id.*)

*United States District Court*

*For the Northern District of California*

**ANALYSIS**

**A.      Legal Standards Applicable to Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattret*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248.

If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party either must produce evidence that negates an essential element of the non-moving party's claims or must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the non-moving party fails to point to evidence precluding

United States District Court

For the Northern District of California

4

1    summary judgment, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477

2    U.S. at 323.

3    **B.**     **Legal Standards for False Marking.**

4            Whoever marks upon, or affixes to, or uses in advertising in connection with
        any unpatented article, the word "patent" or any word or number importing that
5        the same is patented for the purpose of deceiving the public; ... [s]hall be fined
        not more than $500 for every such offense.

6

7    35 U.S.C. § 292(a).[3]  In order to prevail on its false marking counterclaim, Award must

8    demonstrate by a preponderance of the evidence that USG (1) used a mark "importing that an

9    object is patented (2) falsely affixed to (3) an unpatented article (4) with the intent to deceive the

10   public."  *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1351 (Fed. Cir. 2005); *accord*

11   *Mayview Mayview Corp. v. Rodstein*, 620 F.2d 1347, 1359-60 (9th Cir. 1980).

12           The first step in a false marking analysis is to determine whether an article is unpatented,

13   *i.e.*, that the article is "not covered by at least one claim of each patent with which [it] is

14   marked."  *Clontech*, 406 F.3d at 1352.  To do that, "the claim in question must be interpreted to

15   ascertain its correct scope, and then it must be ascertained if the claim reads on the article in

16   question."  *Id.*[4]

17           "Intent to deceive is a state of mind arising when a party acts with sufficient knowledge

18   that what it is saying is not so," *i.e.,* that an article so marked is in fact patented, "and

19   consequently that the recipient of its saying will be misled into thinking that the statement is

20   true."  *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005).  "Intent

21   to deceive ... is established in law by objective criteria."  *Id.*  Thus, "'the *fact* of

22   _____

23           [3]      Section 292 is penal in nature and, therefore, must be strictly construed.
     *Mayview Corp. v. Rodstein*, 620 F.2d 1347, 1359 (9th Cir. 1980)

24           [4]      The district court in *Clontech* concluded that the doctrine of equivalents could
     not be applied to determine if an article was "patented."  *See Clontech Labs., Inc. v.*
25   *Invitrogen Corp.*, 263 F. Supp. 2d 780, 792 (D. Del. 2003).  The Federal Circuit's opinion
     does not expressly address this issue.  Because the parties in this case do not dispute the
26   "unpatented" element, the Court presumes for purposes of this motion that Award has
     established the second and third elements.  The Court notes, however, that, in the instant
27   case, USG essentially takes the position that the products in question are substantially
     covered or equivalently covered in making its functionality argument.  These facts
28   distinguish this case from *Clontech*.  The Court addresses the import of this position in
     resolving the issue of whether there is evidence of an intent to deceive the public.

United States District Court

For the Northern District of California

1   misrepresentation coupled with proof that the party making it had knowledge of its falsity is

2   enough to warrant drawing the inference that there was a fraudulent intent.'" *Id.* (quoting *Norton*

3   *v. Curtiss*, 433 F.2d 779, 795-96 (C.C.P.A. 1970)) (emphasis in original). That is to say, if a

4   party states that an article marked with a patent is covered by the patent when it knows it is not,

5   one can infer that an intent to deceive existed.

6        However, to show the requisite knowledge of falsity a plaintiff in a false marking case

7   "must show by a preponderance of the evidence that [the defendant] did not have a reasonable

8   belief that the articles were properly marked (*i.e.* covered by a patent). Absent such proof of

9   lack of reasonable belief, no liability under the statute ensues." *Id* at 1352-53. Normally, the

10  question of whether "conduct rises to the level of statutory deception is a question of fact." *Id.*

11  at 1353.

12  **C.   Evidentiary Rulings**

13       USG moves to strike certain paragraphs of the Declaration of Andrew Shores, submitted

14  by Award in opposition to USG's motion. USG contends that the opinions set forth in the

15  Shores declaration were not timely disclosed in his initial expert report and, accordingly, should

16  not be considered. The Shores declaration is offered by Award to show that USG's belief that

17  its products were covered by the '198 Patent was unreasonable because if USG had conducted

18  an investigation using any of the methods described by Dr. Shores, USG would have known the

19  products were not covered by the '198 Patent, even under the construction USG proposed.

20  Award also contends, in opposing the motion to strike, that the report was submitted to counter

21  a rebuttal report from USG's expert, Mr. Klass. However, USG did not rely on Mr. Klass'

22  opinions in moving for summary judgment on this issue.

23       Since it filed its false marking claim, Award has known that it would bear the burden of

24  establishing that USG intended to deceive the public and, thus, knew its products were not

25  covered by the '198 Patent. Moreover, Award has known since the parties began briefing the

26  issue of claim construction, that USG contended that the thickness limitation should be

27  measured to include protective coating that penetrated the surface of the front paper layer.

28  Award also has known since that time that USG contended that the purpose of the protective

United States District Court

For the Northern District of California

1  coating was to prevent surface abrasion.  In light of these facts, Award's claims of surprise and

2  its contentions regarding USG's purportedly belated disclosure of a "reasonable mistake"

3  defense ring hollow.

4  The opinions set forth in the Shores declaration bear directly on issues for which Award

5  bears the burden of proof in its affirmative claim for relief against USG.  Award has not

6  provided the Court with a substantial justification for failing to disclose these opinions in

7  Shores' initial expert report.  Accordingly, the Court finds USG's objections well taken and

8  shall not consider the Shores declaration in deciding this motion.

9  Award also seeks to introduce testimony from Charles Klass that it contends it was

10  unable to submit with its opposition because of deposition scheduling.  USG opposes this

11  request and asserts that Award created the delay by not agreeing to conduct the deposition

12  earlier.  Because USG's only basis for objection to this testimony is the scheduling issue, and

13  because USG has submitted additional testimony from Mr. Klass directed to the testimony

14  offered by Award and has presented argument on the points raised by Award in submitting the

15  testimony, the Court GRANTS Award's request to submit the late testimony and shall consider

16  both parties' submissions.

17  **D.  USG Is Entitled to Summary Judgment on Award's False Marking Claim.**

18  It is undisputed that as of approximately 1993, the protective coating on USG's nose

19  coated paper-faced corner bead products measured less than 0.001 inches above the surface of

20  the paper.  The parties dispute whether USG intended to deceive the public when, despite its

21  knowledge of this fact, it continued to mark the products in question with the '198 until March

22  1, 2006.  Although Award's claims of false marking relate to USG, what BeadeX knew and did

23  is relevant to this dispute to the extent USG later relied on representations from BeadeX.

24  There are obvious disputes between the parties about who at BeadeX told what to whom

25  and when, with respect to whether or not the products should be marked.  For example, Mr.

26  Dunham claims he told senior management at BeadeX that he believed the products did not fall

27  within the '198 Patent, although he was unsure if he ever communicated his views to Mr.

28  Ritchie or Mr. King, the named inventors on the '198 Patent.  (Jenkins Decl, Ex. 4 (Dunham

United States District Court

For the Northern District of California

1   Depo. V. 1 at 46:4-47:4, 48:16-25).)  Mr. Radford denies Mr. Dunham made that claim.

2   (*Compare* Dunham Decl., ¶ 9 *with* Radford Decl., ¶ 4.)  The Court does not find these disputes

3   to be material in light of the undisputed fact that, as properly construed by this Court, the nose

4   coated paper-faced bead products did not fall within the literal claims of the '198 Patent as of

5   approximately 1993.  What is material to the resolution of *this* motion, is *why* and *on what basis*

6   USG formed its belief that the patents were marked properly with the '198 Patent

7   notwithstanding the fact that the protective coating above the surface was less than 0.001 inches.

8   That essentially calls for an inquiry into the reasonableness of USG's belief of its proposed

9   claim construction.

10      To meet its burden on summary judgment, USG proffers testimony from Mr. Radford

11   who attests that, after BeadeX learned that the protective coating measured less than 0.001

12   inches above the surface of the paper, members of the BeadeX Defect Reduction Committee

13   discussed the issue.  Mr. Radford states this committee reviewed the '198 Patent and read it to

14   call for a penetrating protective coating.  According to Mr. Radford, because it appeared that the

15   thickness of the protective coating, including penetration depth, fell within the range identified

16   in the '198 Patent, the committee concluded that the products continued to read on the claims of

17   the '198 patent.  (Radford Decl., ¶ 3; Jenkins Decl., Ex. 3 (Radford Depo. at 34:22-35:8).)

18      Mr. Radford also attests that "based on visual observation and the performance of the

19   product, we estimated a coating penetration depth of about 3-4 mils, about halfway through the

20   paper," which in his understanding met the claims of the '198 Patent.  (Radford Decl., ¶ 3.)

21   USG also presents evidence that the specifications BeadeX provided to outside vendors,

22   directed to the thickness of the coating, did not contain a specification relating to the thickness

23   of the coating over and above the top surface of the paper.  (*See* Jenkins Decl., Ex. 4 (Dunham

24    Depo. V. 1 at 139:24-143:15).)  But USG also introduces evidence from Mr. Dunham, a

25   member of this committee, in which he claims "all the members of the BeadeX team, including

26   Mr. Ritchie, understood our invention to require a layer of protective material that exceeded the

27   paper's thickness by about 0.001 to 0.005" inches.  (Jenkins Decl., Ex. 16 at ¶ 10.)  There is no

28

8

United States District Court

For the Northern District of California

1  evidence in the record that Mr. Ritchie's opinion on this issue was communicated to anyone at

2  USG.

3  Mr. Perrine, USG's current director of Marking and Finishing Systems, testified that

4  when USG and BeadeX entered into the private label distribution relationship, he was advised

5  by Mr. Ritchie and other members of BeadeX management that the products were "patented

6  under" the '198 Patent. (Perrine Decl., ¶¶ 1-2; Jenkins Decl., Ex. 5 (Perrine Depo. at 46:18-

7  47:7).) Mr. Perrine also attests that during this relationship, BeadeX continued to mark the

8  products with the '198 Patent, that USG relied on BeadeX for the factual details to be included

9  on the USG private labels, and that no one at BeadeX suggested that there was any reason the

10  '198 Patent should not be on the labels. (*See, e.g.,* Perrine Decl., ¶¶ 3-4; Jenkins Decl., Ex. 5

11  (Perrine Depo. at 52:9-53:25).)

12  Mr. Perrine's testimony as to what he was told by BeadeX is supported by Mr. Ritchie's

13  testimony that he "was under the assumption at the time [that USG and BeadeX were

14  contemplating a business relationship] that [the products were] within this portion of the

15  patent," and that he was confident that he communicated to Mr. Perrine that the product was

16  patented. (Jenkins Decl., Ex. 2 (Ritchie Depo. at 29:19-30:14).) Mr. Ritchie also testified that

17  he never told anyone at USG that the products did not practice the patent because he did not

18  know "it had fallen outside the patent until very recently when Award explained to him how the

19  thickness of the coating fell outside of the – of this patent." (*Id.* at 33:15-21.) USG also

20  provides testimony from Mr. Dunham that because Mr. Ritchie knew more about the '198

21  Patent than he did, Mr. Dunham would rely on Mr. Ritchie's opinion as to what was covered by

22  the patent. (Jenkins Decl., Ex. 6 (Dunham Depo. V. 4 at 103:7-25).)

23  USG also asserts that when it acquired BeadeX, it conducted an independent evaluation

24  of whether the nose coated paper-faced corner bead products were covered by the '198 Patent.

25  According to the record, the independent evaluation consisted of Mr. Perrine's reliance on what

26  he was told by Mr. Ritchie and others at BeadeX, namely that the products were covered by the

27  '198 Patent. (*See, e.g.,* Perrine Decl., ¶ 5; Jenkins Decl., Ex. 5 (Perrine Depo. at 310:14-17).)

28  The evaluation did not consist of any formal analysis of the thickness of the protective coating

United States District Court

For the Northern District of California

1    material.  (Jenkins Decl., Ex. 5 (Perrine Depo. at 312:1-313:3, 316:5-15, 317:2-9).)  Rather, in

2    addition to what he had been told by Mr. Ritchie and others at BeadeX, Mr. Perrine relied on his

3    27 years of experience in the building industry and his experience with coating on drywall

4    paper.  (Perrine Decl., ¶ 6; Jenkins Decl., Ex. 5 (Perrine Depo. at 315:5-316:4).)  Based on that

5    experience, and knowing that the patent called for penetrating coating and some "visual

6    observation", Mr. Perrine "believed that the total coating thickness on the BeadeX products was

7    at least 1-3 mils."  (Perrine Decl., ¶ 6; *see also* Jenkins Decl., Ex. 5 (Perrine Depo. at 316:15-

8    317:1, 317:10-318:22).)  USG also relies on the fact that it acquired BeadeX for approximately

9    $75 million to negate an intent to deceive the public, asserting it would have been unreasonable

10   to pay that much for a company if the products in question did not have patent protection.

11   (Perrine Decl., ¶ 7.)

12          Finally, in approximately August 2004, before this case was filed and well before the

13   Court construed the claims of the '198 Patent, USG proffers evidence that it reviewed scanning

14   electron photomicrographs ("SEMs") of cross-sections of its nose coated paper-faced corner

15   bead products.  (Perrine Decl., ¶ 12 and Ex. 1.)  According to Mr. Perrine he was advised by the

16   person who conducted the analysis that those SEMs show that the protective coating had a total

17   thickness, including penetration depth, of approximately 0.002 inches, which is also supported

18   by evidence put forth by Award.  (*Id.*; *see also* Jenkins Decl., Ex. 5 (Perrine Depo. at 114:1-

19   115:21; 118:25-119:8; 334:2-15); Declaration of Nicole S. Cunningham ("Cunningham Decl."),

20   Ex. D (Perrine Depo. at 121:14-123:19.)  Because, as USG interpreted the '198 Patent, this

21   thickness fell within the scope of the claims, USG continued to mark its paper-faced corner bead

22   products with the '198 Patent.  (Perrine Decl., ¶ 12.)

23          In an effort to rebut USG's contentions that it reasonably believed the products to be

24   covered by the '198 Patent, Award suggests that Mr. Perrine is not a person of ordinary skill in

25   the relevant art, so that his beliefs cannot establish a reasonable belief that the products were

26   covered by the Patent. (Cunningham Decl., Ex. C (Klass Depo. at 32:23-34:15), Ex. D (Perrine

27   Depo. at 130:18-137:3).)  Award also proffers the testimony of Mr. Klass, who testified he

28

1   would not rely solely on a visual observation to determine the thickness of the coating.  (5/12/06

2   Klass Depo. at 105:2-22.)[5]

3        Award also proffers the declarations of Mr. Dunham and Mr. Walker, who were

4   members of Defect Reduction Committee and who deny that the committee discussed whether

5   the products still were covered by the '198 Patent.  They also deny the conclusions Mr. Radford

6   claims the committee reached.  (*See* Dunham Decl., ¶¶ 16-19; Declaration of Rick Walker

7   ("Walker Decl."), ¶ 6.)  Mr. Dunham attests that he was under the impression that Mr. Radford

8   agreed with his opinion that the products were not covered, but that he awaited further direction

9   from Mr. Radford.  (Dunham Decl., ¶ 9.)  Mr. Dunham also testified that he "just voiced [his]

10  opinion to [senior management] and expected they would know what to do with it," but

11  conceded that Mr. Ritchie as president of the company would be responsible for decisions made

12  and that he, Mr. Dunham, would rely on Mr. Ritchie's opinion as to whether the products should

13  be marked with the '198 Patent.  (Jenkins Decl., Ex. 6 (Dunham Depo. V. 4 at 102:1-103:25).)

14       Mr. Dunham also declares that after he expressed his opinions, he was advised by Mr.

15  Radford that BeadeX did not want to spend the money associated with obtaining a new patent

16  and would take the position that the thinner coatings were covered.  Mr. Dunham claims that he

17  advised Mr. Radford this was an untenable position.  (*See* Dunham Decl., ¶¶ 10-14.)[6]

18       Award also tries to show USG's belief was unreasonable by proffering evidence to show

19  that Mr. Ritchie believed "we needed a minimum of 0.001 of an inch to provide necessary water

20  and sanding resistance."  (Cunningham Decl., Ex. A ("Ritchie Depo. at 84:4-13); *see also id.*

21  (Ritchie Depo. at 39:18-40:9, 43:3-16, 45:3-14, 83:9-18, 84:4-13 (discussing his belief that a

22  minimum layer of coating above the surface was required).)  Mr. Ritchie also testified, however,

23  the fact that Award had determined BeadeX was outside the patent came as a surprise to him.

24  (*Id.* at 55:15-19).)

---

25

26      [5]      Attached to the Declaration of Colbern Stuart in Support of Award's Motion
    for Administrative Relief for Leave to Submit Recent Deposition Testimony..

27      [6]      The Court notes that this is the only evidence that Award proffers that
    suggests USG had an improper motive in continuing to mark its products with the '198
28  Patent.  The rest of the evidence presented speaks to the reasonableness of USG's
    construction of the claims of the '198 Patent.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

Award also puts forth evidence that, with respect to another aspect of the '198 Patent, Mr. Perrine acted "conservatively" and removed that patent number from some products that he believed could be read to not fall within the scope of that aspect of the '198 Patent. (Cunningham Decl., Ex. D (Perrine Depo. at 325:12-326:16).)  Award argues that this conservative view belies the reasonableness of USG's view with respect to the thickness limitation.  Finally, with respect to USG's argument that it would not have acquired BeadeX for $75 million if its products had not been patented, Award proffers Mr. Ritchie's testimony that, at the time USG acquired BeadeX, he believed the value of the '198 Patent had diminished. (Cunningham Decl., Ex. A (Ritchie Depo. at 34:10-14).)

Award also argues that after the Court construed the '198 Patent in November 2005, USG's decision to continue to mark the products with the '198 Patent was improper.  Award contends that USG's argument that the products functioned in substantially the same way, notwithstanding what it contends is an insubstantial difference with respect to the thickness limitation, they would fall within the claims of the '198 Patent.  Although the thickness limitation is the focus of the instant motion, the Court also construed protective coating to mean:  "The material applied to the front paper layer to reinforce said front paper layer and to provide surface protection against abrasion."  (Claim Construction Order at 7:17-18.)  Award does not put forth any evidence to suggest that a function of the protective coating taught by the '198 Patent is not to provide surface protection against abrasion.

Considering all of these facts and the reasonable inferences therefrom in the light most favorable to Award, as it must, the Court concludes that these facts simply do not give rise to a disputed issue of fact as to whether between 1993 and March 1, 2006, USG intended to deceive the public when it marked its nose coated paper-faced corner bead products with the '198 Patent.  Accordingly, the Court concludes that USG is entitled to judgment in its favor on the false marking claim.

1

## CONCLUSION

2          For the foregoing reasons, USG's motion for summary judgment is GRANTED.

3          **IT IS SO ORDERED.**

4

5    Dated:   June 12, 2006

6                                                          _____
                                                          JEFFREY S. WHITE
                                                          UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California